## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| COURTNEY MEANS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 2:11-cv-02646-JPM-tmp |
| | ) | |
| SHAWN PHILLIPS, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## ORDER TO MODIFY THE DOCKET,
## GRANTING IN PART AND DENYING IN PART THE
## PETITION FOR AN UNCONDITIONAL WRIT OF HABEAS CORPUS
## AND REQUIRING PETITIONER'S UNCONDITIONAL RELEASE
## FROM THE JUDGMENTS AT ISSUE WITHOUT PREJUDICE

Before the Court is the Petition for Issuance of an Unconditional Writ of Habeas Corpus, filed by Petitioner, Courtney Means, Tennessee Department of Correction prisoner number 375663, who is currently incarcerated at the Morgan County Correctional Complex ("MCCX") in Wartburg, Tennessee. (Pet. for Unconditional Writ of Habeas Corpus, ECF No. 38.)[1] For the reasons stated below, the Petition for Issuance of an Unconditional Writ of Habeas Corpus is GRANTED IN PART and DENIED IN PART. The Court ORDERS that Respondent unconditionally release Petitioner from custody on his convictions in Case Numbers 03-05190,

---

[1] The Clerk is directed to substitute MCCX Warden Shawn Phillips for Jerry Lester as respondent in this matter. *See* Fed. R. Civ. P. 25(d).

03-05192 and 03-05194 within five business days from the date of entry of this order.[2]  This order is without prejudice to Respondent's right to resentence Petitioner on these convictions.

## I.     BACKGROUND

### A.     State Court Procedural History

On August 5, 2003, a grand jury in Shelby County, Tennessee, returned three indictments charging Means and Derrick Burroughs with aggravated robbery.  Case Number 03-05190 contained two counts charging Means and Burroughs with the aggravated robbery of Robert Hollie on December 22, 2002.  (Indictment, *State v. Means*, No. 03-05190 (Shelby Cnty. Crim. Ct.), ECF No. 16-1 at PageID 124-26.)  Case Number 03-05192 contained four counts charging Means and Burroughs with the aggravated robbery of Robert Hill and Sarah Hill on December 22, 2002.  (Indictment, *State v. Means*, No. 03-05192 (Shelby Cnty. Crim. Ct.), ECF No. 16-1 at PageID 127-31.)  Case Number 03-05194 contained two counts charging Means and Burroughs with the aggravated robbery of Carolyn Fredrickson on December 18, 2002.  (Indictment, *State v. Means*, No. 03-05194 (Shelby Cnty. Crim. Ct.), ECF No. 16-1 at PageID 132-34.)

A jury trial on the charges against Means commenced on May 3, 2004 and, on May 4, 2004, the jury returned guilty verdicts on all counts.  (Trial Tr. 127-29, *State v. Means*, Case Nos. 03-05190, -05192, -05194 (Shelby Cnty. Crim. Ct.), ECF No. 16-4 at PageID at 417-19.)  At a sentencing hearing on June 3, 2004, Means was sentenced as a Range I standard offender to an effective term of imprisonment of eighteen years.  (Sentencing Hr'g Tr. 8-10, *id.*, ECF No. 16-5.)[3]  The Tennessee Court of Criminal Appeals ("TCCA") affirmed.  *State v. Means*, No.

_____

[2] Because Petitioner has other sentences to serve, this order will not result in his release from prison.

[3] Means was sentenced to nine years on each indictment.  The trial court ordered the sentences in Case Numbers 03-05190 and 03-5194 to run concurrently to each other but consecutive to the sentence in Case Number 03-05192.  (*Id.* at 9.)

W2004-01446-CCA-R3-CD, 2005 WL 1323260 (Tenn. Crim. App. June 3, 2005), *appeal denied*, (Tenn. Dec. 5, 2005).

On or about March 7, 2006, Means filed a *pro se* petition in the Shelby County Criminal Court pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122. (Pet. for Post-Conviction Relief, *Means v. State*, Case Nos. 03-05190, -05192, -05194 (Shelby Cnty. Crim. Ct.), ECF No. 16-6 at PageID 456-64.) Counsel was appointed to represent Means. (Order Appointing Private Counsel to Represent Def., *id.*, ECF No. 16-6 at PageID 465.) Amendments to the petition were filed on November 21, 2006 (Am. & Suppl. Pet. for Post Conviction Relief, *id.*, ECF No. 16-6 at PageID 466-67), April 20, 2007 (Am. & Suppl. Pet. for Post Conviction Relief, *id.*, ECF No. 16-6 at PageID 468-70), and September 18, 2007 (Additional Am. & Suppl. Pet. for Post Conviction Relief, *id.*, ECF No. 16-6 at PageID 471-74). The post-conviction court held a hearing on February 19, 2008 (Post-Conviction Relief Hr'g Tr., *id.*, ECF No. 16-8) and denied relief on May 1, 2008 (Order Denying Pet. for Post-Conviction Relief, *id.*, ECF No. 16-6 at PageID 476-84). The TCCA affirmed. *Means v. State*, No. W2008-01039-CCA-R3-PC, 2010 WL 2490771 (Tenn. Crim. App. June 21, 2010), *appeal denied*, (Tenn. Oct. 20, 2010).

The TCCA summarized the evidence introduced at trial:

> All four robbery victims were robbed at gunpoint in the driveways or carports of their Memphis homes during the Christmas holiday shopping season of December 2002. At the defendant's May 3, 2004, trial, the first robbery victim, sixty-three-year-old Carolyn Fredrickson, testified she was loading three dogs into her car at about 3:00 p.m. on December 18, 2002, when she noticed a burgundy, square-looking vehicle with a drive-out tag in the rear window pull up on the street outside her home and a young man run across her yard. Assuming he was coming to sell her something, she continued placing the dogs into her car. When she raised up, the young man was holding a silver handgun against her neck and demanding her purse. After she handed it to him, he ran back to the waiting vehicle and got in the passenger side and the driver sped away. Approximately one month later, Fredrickson identified the defendant as the armed

robber by picking his photograph out of a photographic array at the police department. She also made a positive courtroom identification of the defendant as her assailant and identified a photograph of the defendant's vehicle as similar in appearance to the getaway vehicle used in the robbery.

The second and third victims, husband and wife Robert and Sara Alice Hill, were robbed in their open garage at approximately 2:30 p.m. on December 22, 2002. At trial, eighty-two-year-old Robert Hill testified he and his wife were unloading Christmas packages from the trunk of their vehicle when a man came up behind him, placed a shiny automatic pistol against his face, and demanded his wallet, his wife's purse, and their car keys. Hill said the gunman threatened to shoot them if they did not comply with his demands. He testified that after they had handed the items over, the man threw the car keys down at the gate and ran to a waiting car, which was driven by another man. Hill described the getaway vehicle as a maroon or dark red Mercury or Chevrolet with a drive-out tag in the rear window, and he agreed it was very similar in appearance to the photograph of the defendant's vehicle.

Later that same afternoon, Robert Hollie was robbed in the carport of his home by a young man with a silver pistol who fled in a similar-looking vehicle. Hollie, who was sixty-four years old at the time of trial, testified he was unlocking the door to his house at approximately 4:30 p.m. when a young man ran up, pointed a silver gun at his head, and shouted, "Get in the house or I'll shoot." Knowing that his wife was inside the house, Hollie began grappling with the gunman for the weapon. As he struggled, he ended up on his knees but still managed to retain his grip on the weapon and the gunman. At that point, however, a second man ran up and kicked him in the face and shoulder, breaking his nose. Hollie testified that when the second man began to kick him a third time, he grabbed the second man's leg and the gunman was able to break away. He said the gunman took his wallet, and both men fled to a burgundy vehicle with a drive-out tag in the rear window and a luggage rack on the trunk. Hollie was unable to identify the robbers but, like Hill, agreed that the getaway vehicle was similar in appearance to the photograph of the defendant's vehicle.

On January 15, 2003, police officers were dispatched to a Memphis check cashing business in response to a report that someone was attempting to cash a stolen check. When they arrived, they found the defendant in the driver's seat of his maroon Oldsmobile Cutlass, which had a drive-out tag in the rear window and a luggage rack on the trunk. In the subsequent search of the defendant's vehicle, the officers discovered a chrome nine-millimeter, semi-automatic weapon hidden beneath the carpet behind the vehicle's brake pedal. The defendant initially denied any involvement in the crimes but eventually issued three statements in which he detailed his participation in the robberies.

*State v. Means*, 2005 WL 1323260, at *1-2.

**B.      Procedural History of Means' § 2254 Petition**

On July 29, 2011, Means filed a *pro se* Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody ("§ 2254 Petition"). (§ 2254 Pet., *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 1.) The § 2254 Petition presented the following issues:

1.      Whether Petitioner was denied his Sixth Amendment right to a jury trial (§ 2254 Pet. at 5-12, *id.*, ECF No. 1); and

2.      Whether Petitioner's attorney rendered ineffective assistance, in violation of the Sixth Amendment (*id.* at 12-20).

In an order issued on November 18, 2011, the Court ordered Respondent to file the state-court record and a response to the § 2254 Petition. (Order, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 6.)

On January 10, 2012, Respondent filed a Motion to Dismiss the § 2254 Petition as time barred. (Mot. to Dismiss Pet., *id.*, ECF No. 11.) Respondent ignored the portion of the Order that required him to file the record. On February 2, 2012, Means filed a response to the Motion to Dismiss. (Pet'r's Resp. to Mot. to Dismiss, *id.*, ECF No. 12.) Also on February 2, 2012, Means filed a Motion to Strike Respondent's Motion to Dismiss on the ground that it was not an appropriate response to a § 2254 petition. (Mot. to Strike, *id.*, ECF No. 14.) Respondent did not respond to that Motion.

The Court issued an order on June 20, 2012, that, *inter alia*, denied Petitioner's Motion to Strike, denied Respondent's Motion to Dismiss and directed Respondent, for the second time, to file the state-court record and a response to the § 2254 Petition. (Order, *id.*, ECF No. 13.)

On July 13, 2102, Respondent filed an Answer to Petition and the state-court record. (Answer, *id.*, ECF No. 15; Not. of Filing Docs., *id.*, ECF No. 16.) In his Answer, Respondent conceded that Means was sentenced in violation of the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004), but argued that the error was harmless. (Answer at 9-10, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 15.) On September 11, 2012, Means filed his Traverse and Response to Respondent's Answer ("Reply"). (Reply, *id.*, ECF No. 18.)

The Court issued an order on August 5, 2013, that, *inter alia*, granted relief on Claim 1 insofar as it asserted a violation of *Blakely*. (Order at 24-25, *id.*, ECF No. 29.) Specifically, the Court held that "[t]he sentencing judge in the instant case increased Means' sentence for each armed robbery from the presumptive minimum of eight years to nine years on the basis of four enhancement factors, two of which have been found to be unconstitutional under *Blakely*." (*Id.*) The two sentencing factors at issue were that Means "was a leader in the commission of an offense involving two (2) or more criminal actors," Tenn. Code Ann. § 40-35-114(3), and that "[a] victim of the offense was particularly vulnerable because of age or physical or mental disability, Tenn. Code Ann. § 40-35-114(5) . . . ." (Order at 20, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 29.) Because the Court was not persuaded that the constitutional error was harmless, the Court granted the § 2254 Petition as to Claim 1. (*Id.* at 25.) The Order provided as follows:

> The State must either reduce Means' sentence for each count from nine years to eight years or must afford Means a new sentencing hearing within one hundred eighty (180) days from the date of entry of this Order. The Court's holding does not affect the trial court's determination regarding the imposition of consecutive sentences.

(*Id.*; *see also id.* at 30 (same).)  A judgment was entered on August 5, 2013.  (J. in a Civil Case, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 30.)

On August 29, 2013, Respondent filed a Motion to Alter or Amend Judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.  (Mot. to Alter or Amend J., *id.*, ECF No. 31.)  In that Motion, Respondent asked the Court to "alter or amend its judgment to conduct its harmless error analysis under the *Fry* standard used for collateral review of state decisions rather than under the standard used for direct review of federal sentences."  (*Id.* at 1 (citing *Fry v. Pliler*, 551 U.S. 112 (2007)).)

On September 22, 2013, Means filed a Motion to Request Stay of Proceedings to Enforce a Judgment in Response to Respondent's Motion to Alter or Amend Judgment, which was intended, in part, as a response to the Motion to Alter or Amend Judgment.  (Mot. to Request Stay of Proceedings, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 32.)  In his Motion, Means asked for an order transferring him to the Shelby County Criminal Court, directing that his motions filed in that court, which had requested a new sentencing hearing and to have his sentences run concurrently, be addressed, and that a decision issue within 142 days.  (*Id.*)

On November 8, 2013, Respondent filed a Motion to Stay Judgment Pending Disposition of Motion, which asked that the Court stay the execution of its Judgment, or any proceedings to enforce the Judgment, pending the disposition of Respondent's Motion to Alter or Amend Judgment.  (Mot. to Stay J., *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 34.)  On December 5, 2013, the Court issued an Order granting Respondent's Motion to Stay Judgment.  (Order, *id.*, ECF No. 35.)

In an order issued on March 6, 2014, the Court, *inter alia*, granted in part and denied in part the Motion to Alter or Amend Judgment. (Order, *id.*, ECF No. 37.) Specifically, the Court modified certain language in its August 5, 2013 Order, concluded that those alterations did not alter the conclusions reached in the previous Order, lifted the stay that had been imposed on December 5, 2013, and directed that "[t]he State must either reduce Means' sentence for each count from nine years to eight years or must afford Means a new sentencing hearing within one hundred eighty (180) days from the date of entry of this Order. The Court's holding does not affect the trial court's determination regarding the imposition of consecutive sentences." (*Id.* at 8.)

On October 1, 2014, Means filed his Petition for Issuance of an Unconditional Writ of Habeas Corpus, in which he sought his unconditional release on the convictions at issue because the State had failed to reduce his sentence within one hundred eighty days. (Pet. for Unconditional Writ of Habeas Corpus, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 38.) Respondent did not file a timely response to the Petition.[4]

On October 10, 2014, the Court issued an order directing the issuance of a writ of habeas corpus *ad testificandum* for Means and setting an evidentiary hearing. (Order, *id.*, ECF No. 39; Writ of Habeas Corpus Ad Testificandum, *id.*, ECF No. 40; Setting Letter, *id.*, ECF No. 41.)

---

[4] Respondent's response was due 14 days after service of the motion. (Local Rule 7.2(a)(2).) Although the Petition does not contain a certificate of service, it was signed on September 24, 2014 and postmarked on September 29, 2014. (*See* Pet. for Unconditional Writ of Habeas Corpus at 3, *id.*, ECF No. 38; Mailing envelope, *Means v. Phillips*, No. 1:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 38-5.) Even if the running of the time for a response were assumed to have commenced on October 1, 2014, the date on which the Petition was docketed, the response was due on October 15, 2014.

On October 17, 2014, Respondent filed a motion for leave to file a written response to the Petition and to continue the evidentiary hearing. (Resp't's Mot. to Permit a Written Resp., *id.*, ECF No. 42.) Respondent explained that he

> failed to respond to [Means' Petition] . . . because: (1) the Warden's previous counsel of record had resigned from the Tennessee Attorney General's office in the period between entry of the Court's March 2014 order re-affirming the conditional writ and the filing of petitioner's motion [sic] in October 2014; and (2) the case file was administratively closed within the Attorney General's office after this Court's March 2014 order became final and was not re-assigned to new counsel. Undersigned counsel only became aware that petitioner had filed a Petition for Unconditional Writ of Habeas Corpus after being notified of the Order setting an evidentiary hearing on October 10, 2014.

(*Id.* at 2-3.)[5] Respondent asked the Court to excuse his untimely response because of the "unusual circumstance and the absence of any bad faith in failing to respond to the latest petition . . . ." (*Id.* at 3.) Respondent also requested leave to file an untimely written response and continuation of the evidentiary hearing, noting that "the State of Tennessee had already complied with this Court's order as of the filing of petitioner's motion by reducing the sentences on each count of his criminal judgment from nine to eight years . . . ." (*Id.*) Attached to Respondent's Motion were copies of amended judgments that had been entered on September 12, 2014.[6]

The Court issued an order on October 20, 2014, that granted Respondent's motion for leave to file a written response but declined to continue the evidentiary hearing because "[t]he attachments to Respondent's instant motion indicate that Respondent failed to cure the

---

[5] The Motion to Permit a Written Response was filed by Deputy Attorney General Jennifer L. Smith, a senior lawyer with the Attorney General's Office. Smith likely learned that a hearing had been set after service of the writ of habeas corpus *ad testificandum* on Respondent.

[6] Copies of the amended judgments are attached to Respondent's Motion at ECF No. 42-1.

constitutional error within the 180 days specified by the court." (Order at 1, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 43.)[7]

On October 24, 2014, Respondent filed his written Response to Petition for Issuance of an Unconditional Writ of Habeas Corpus. (Resp. to Pet. for Issuance of an Unconditional Writ of Habeas Corpus, *id.*, ECF No. 45.) In his Response, Respondent argued that the Petition should be denied because:

> (1) the constitutional deficiency identified in this court's August 5, 2013 order granting a conditional writ of habeas corpus has been cured by entry of amended judgments on September 12, 2014; (2) any delay in resentencing the petitioner in accordance with the court's order was the result of administrative errors and not deliberate disregard or contempt of this court's order; (3) the petitioner suffered no prejudice from the State's 10-day delay in complying with the court's conditional writ; and (4) the court's August 5, 2013 order, granting a conditional writ of habeas corpus upheld the validity of petitioner's convictions on ten [sic] counts of aggravated robbery, and unconditional release is not justified where his sentences for those offenses have not expired.

(*Id.* at 1-2.) Respondent concluded that, "because the state did not simply ignore the court's order but only failed to comply timely due to an inadvertent administrative error," the Court should "grant a 10-day extension *nunc pro tunc* to comply with the court's conditional writ of habeas corpus." (*Id.* at 2.)

The Response also explained why Respondent had failed to comply with the Court's order within the time specified:

> [U]pon issuance of the court's March 6, 2014 order granting in part and denying in part the respondent's motion to alter or amend the judgment, respondent's counsel promptly contacted the Shelby County District Attorney General's office and advised petitioner's prosecuting attorney of this court's directive, specifically the need to amend the petitioner's sentence by September 2, 2014. Respondent's counsel followed up that telephone conversation by email and letter.

---

[7] Two days later, Assistant Attorney General Nicholas W. Spangler filed a notice of appearance. (Not. of Appearance, *id.*, ECF No. 44.)

As a result of those communications, the prosecutor made an entry on his calendar for action related to the case.[8] The prosecutor then notified the Clerk of Court that the case would require docketing for purposes of amending the judgment. At that time, however, neither the Assistant District Attorney nor the Clerk of Court had yet received a copy of this court's order. On or around September 9 or 10, 2014, the matter again came to the prosecutor's attention when he received, for the first time, a copy of this court's order. The prosecutor immediately brought the matter to the [trial] court's attention and obtained amended judgments curing the constitutional sentencing deficiency on September 12, 2014.

(*Id.* at 4-5 (additional footnote omitted).)

At the scheduled hearing on October 27, 2014, the Court appointed the Federal Defender's Office to represent Means. The Court granted counsel's request for a thirty-day continuance and set a new hearing date of November 25, 2014. (Min. Entry, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 46; Order Appointing the Federal Defender's Office as Counsel, *id.*, ECF No. 47.) On November 3, 2014, Means' attorney filed a motion seeking leave to file a reply brief and asking the Court to set a filing deadline. (Unopposed Mot. for Leave to File a Reply Br. and to Set a Filing Deadline, *id.*, ECF No. 57.) In an order issued on November 4, 2014, the Court, *inter alia*, granted leave to file a reply and directed that the reply be filed by November 20, 2014. (Order, *id.*, ECF No. 58.)[9] The Court subsequently extended the time to file the reply and continued the evidentiary hearing. (Order, *id.*, ECF No. 61.) On December 2, 2014, Means filed his Reply Brief in Support of the Petition for Issuance of an Unconditional Writ of Habeas Corpus. (Reply, *id.*, ECF No. 66.)

An evidentiary hearing on Means' Petition was held on December 9, 2014. (Min. Entry, *id.*, ECF No. 67.) At the conclusion of the hearing, the Court asked the parties to submit briefs

---

[8] The prosecutor failed to notice at that time that he had inadvertently calendared the matter for September 12, 2014 rather than September 2, 2014.

[9] On October 27, 2014, Means filed various documents *pro se*. (Not. of Filing, *id.*, ECF No. 54; Not. of Filing, *id.*, ECF No. 55.) Because persons who are represented by counsel may not make *pro se* filings, these documents will be disregarded.

on whether the trial judge would be authorized to revisit the issue of consecutive sentences if the writ were granted and the State were allowed to hold a new sentencing hearing. (§ 2255 Hr'g Tr. 49-54.)[10] Respondent filed his supplemental brief on December 12, 2014 (Resp't's Suppl. Br. on Remand, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 68),[11] and Means filed his supplement on December 22, 2014 (Pet'r's Resp. to Resp't's Suppl. Br., *id.*, ECF No. 69).

## C.    The Evidentiary Hearing

At the evidentiary hearing on December 9, 2014, the State called only Paul Hagerman, the Assistant Shelby County District Attorney General who prosecuted Means on the indictments at issue. (§ 2255 Hr'g Tr. 6.) At the time of the hearing, Hagerman had worked for the District Attorney General for "[p]robably about 13 years." (*Id.*) Hagerman was asked to describe the facts underlying Means' string of armed robberies, and he responded:

> I got moved over from criminal court division 10 into our Gang Unit, and one of the cases I inherited was Mr. Means' case, and he had three co-defendants, I think. It was multiple aggravated robberies. My recollection is somewhere between 15 and 20 aggravated robberies that the four defendants were responsible for. It wouldn't be all four each time, but a combination of the four, had about 20

---

[10] Although neither party ordered a transcript of the evidentiary hearing, the reporter prepared a transcript for use by the Court.

[11] At the evidentiary hearing, counsel for Means took the position that, if Means were released from his previous judgments, "when he goes back for resentencing, it would be a fresh resentencing," meaning that the State would have to file a motion for consecutive sentencing if it did not want the sentences to run concurrently. (§ 2255 Hr'g Tr. 49.) When it asked the parties to file supplemental briefs, the Court took pains to note that it was not looking for a prediction about what the state-court judge would do or an argument about the equities but, instead, a statement by the State of Tennessee of what the trial judge was legally authorized to do. (*Id.* at 49, 51.) The State's supplemental brief did not provide the clarity the Court had asked for. The State asserted that "nothing would compel a state court to revisit the issue of consecutive sentencing" and that, even if the issue were considered, the court would not be precluded from re-imposing consecutive sentences. (Resp't's Suppl. Br. on Remand at 5, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 68.) The State's discussion of remand orders from the Tennessee appellate courts does not appear to be germane to the scope of a trial judge's order after the issuance of an unconditional writ.

or so indictments for aggravated robbery. The facts of the cases were that the defendants—there's—there was a Kroger at Quince and Ridgeway, they would hang out in the area of that Kroger and they would watch the ATM machine, and then they would follow elderly individuals who had gone to the ATM machine or gone to the Kroger there back to their homes in the Balmoral area, which is right there, it's a little subdivision or neighborhood, and then there were, as I said, 15 to 20 aggravated robberies, driveway robberies of the elderly victims. That's basically the facts of the case.

Q. It's fair to characterize these as violent offenses?

A. Well, they were all aggravated robberies, they were all at gunpoint, they were all of elderly individuals.

(*Id.* at 6-7.) Hagerman testified that

I believe Mr. Means had three trials. Various of the robberies were consolidated for the various trials, and I believe we had three trials, and that was my last involvement in Mr. Means' case. I didn't handle his appeals, his various post-convictions and, of course, any habeas writs or anything like that.

(*Id.* at 8.)

Hagerman recalled that Assistant Attorney General Kyle Hixson called him in March 2014 concerning Means' federal habeas case. (*Id.*) According to Hagerman, "Whenever something happens when [sic] the cases we tried, the attorney general's office is supposed to contact us, and he called me and he told me, and I believe it was before the judge had actually made his ruling." (*Id.*) Hagerman continued:

He called me and said that there was this federal habeas litigation going on, that he expected the judge to rule to reduce certain of the sentences due to our sentencing laws at the time and the cases that had come out. He asked me my opinion. When he told me what the reduction was, I told him that sounded fine, what do I need to do, or what do we need to do, and he said, well, the judge hasn't ruled yet, so I will get back to you. And my assumption is that would have been around March of 2014.

Q.      Is it fair to say he was giving you a heads-up that there would need to be amended judgments entered in Mr. Means' case?

A.      That was his expectation, yes, sir.

(*Id.* at 9.)

In response to what happened next, Hagerman testified as follows:

After that phone call, I would say either a day or two after that phone call, he sent me an e-mail, and he may have called me too, I can't remember that, but a day or two afterwards, he called me and sent me an e-mail that said the judge had, in fact, ruled as expected that those sentences needed to be amended, and I think that was what—that was the e-mail, and maybe I called him back and asked him when, but—or maybe we swapped e-mails, but he told me six months from then.

(*Id.* at 9-10.)  At that point, Hixson told Hagerman that the amended judgments had to be entered by September 2, 2014.  (*Id.* at 10.)  Hagerman mistakenly recorded the deadline in his Outlook calendar as September 12, 2014.  (*Id.*)

Hagerman was asked whether he advised the Criminal Court Clerk's staff that the *Means* case should be docketed for the purpose of amending the judgments, and he replied:

Well, yes and no.  Within a day or two of receiving the e-mail from Mr. Hixson saying six months is needed to be done, I went to criminal court division 1.  Now, that is where at least two of Mr. Means' trials were. . . .  I went to criminal court division 1, and I asked the clerks in there what I needed to do. There was this federal writ on the Courtney Means' case, and they told me that they would receive the opinion and they would docket it.  That is the procedure at 201 Poplar when an appellate decision or something is entered that affects the judgment, the criminal court clerk's office dockets the matter, it shows up on the docket, and the prosecutors who are assigned into the courtroom or in that particular courtroom will see this entry on the docket, they will consult the clerk's jacket, there will be a copy of the opinion in there, and in the case of amended judgments or something like that, the prosecutors in the courtroom, in this case, criminal court division 1 would have entered amended judgment sheets, and so the clerks in the courtroom confirmed we'll get the opinion and we'll docket it.

(*Id.* at 10-11.)  The Clerk's office automatically received copies of opinions issued in direct appeals and post-conviction appeals, which were then docketed.  (*Id.* at 11.)  Hagerman made

clear to the Clerk's office staff that he was referring to an order by a federal court.  (*Id.* at 11-12.)

He then testified as follows:

> Q.    And they said they were waiting on the federal order or that they would wait on the federal order?

> A.    They said they would get it and it would be docketed.

(*Id.* at 12.)

> In response to whether he eventually received a letter from Hixson, Hagerman replied:

> I went to the criminal court clerks in Division 1 twice because a short time after that first time, I received a letter in the mail from Courtney Means, and that letter stated that he did not want these changes in the sentence, that he wanted this whole matter dismissed and he wanted to get out of jail.[12]  I either called or e-mailed Mr. Hixson and asked him, because I had never seen the federal order, asked him whether or not the defendant had a right to be present if and when these judgments were amended, and he either called me or e-mailed me back and said he consulted people in his office and he does not think so.  So I went back to [the] criminal court clerk's office, and this would have been within two weeks, I would say of the first time I talked to Mr. Hixson about it, I went back there again and asked him whether or not it had been done yet, and they said no, but they said, again, the order will come and we will put it on the docket.

(*Id.*)  Hagerman testified that, in addition, "the very first time Mr. Hixson contacted me, I ordered our file, the [district] attorney general's office file on Mr. Means just so we could make the notations on the file."  (*Id.* at 13.)  Hagerman clarified that the notations in the District Attorney General's file would show the amended judgments with the new sentences.  (*Id.*)

The State asked Hagerman whether he received a letter from Hixson in March 2014 that included a copy of the federal order, and he replied:

> So I saw a letter from Mr. Hixson that had attached—it had attached to it the federal order, and I got that on the Wednesday before September 12.

> Q.    Go ahead.

---

[12] Exhibit D to the Petition is a letter from Means to Hagerman, dated March 21, 2014. (*See* Pet. for Unconditional Writ of Habeas Corpus, Ex. D, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 38-4.)

> A.     If September 12 was a Friday, it would have been September 10th, and this was an old letter that came to me. My office is in the basement of 157 Poplar which is across the street from 201, either Amy Weirich or Steve Jones had—that's my boss, another individual in my office had sent me a letter that Mr. Hixson had sent our office, and Mr. Hixson's letter had explained the decision, had said the amended judgment sheets need to be entered and had attached the federal order specifically saying the deadline and everything like that. The letter that I received on the 10th had a Post-If Note on the front of it that was in Amy's handwriting asking whether or not anything had ever been done on this and that it had notes all over the letter from Steve Jones who had, I guess, sort of summarized the letter, he would just draw squiggles around the paragraph and says this means these sentences need to be reduced to, you know, such and such. So I received this letter that obviously had been reviewed by the people in my office on that Wednesday, yes, sir.

(*Id.* at 13-14.) Hagerman was shown a copy of Hixson's letter, which he identified as the letter he had received in September 2014 "[m]inus, of course, the Post-It Note, the notations from Steve Jones and a copy of the federal order which was attached to it." (*Id.* at 14.) The letter was dated March 10, 2014 and was addressed to Shelby County District Attorney General Amy Weirich, with a courtesy copy to Hagerman. (*Id.* at 14-15.) Hagerman agreed that the letter stated that amended judgments had to be entered by September 2, 2014. (*Id.*)[13]

Hagerman was asked whether he had been operating under the mistaken belief that he had until September 12 to get the judgments amended. He answered:

> Well, yes and no. When I received this letter with the Post-It Note and the order on what would have been I guess September 10th, whenever that Wednesday is, I was shocked, I was like surely this has been five or six months since Mr. Hixson got in contact with me. So I—I was shocked and I guess kind of scared, so I immediately got on my computer and started looking up Mr. Means' indictment numbers to look up to see whether or not any of them had been in court recently for the amended judgments, you know, to be entered. And I looked up all the indictment numbers, I did not see any recent dates. So I was like I can't believe this hadn't been done. I saw on my calendar September 12th, so I guess I was like, well, at least we got it before the deadline. I was going out of town that Thursday morning, so I had an individual that works with me go

---

[13] The letter was not marked as an exhibit at the evidentiary hearing and is not before the Court.

directly to criminal court division 1 on that Thursday morning with instructions to no matter if the clerk had their jackets or no matter if the DA's office ever found their file, to talk with the judge and get these things entered because the deadline is the 12th.

(*Id.* at 15-16.)  In response to whether he had provided the federal order to the Clerk's office, Hagerman testified, "No, I never saw that order until I received this letter in September."  (*Id.* at 16.)[14]  When Hagerman received the order, he sent a colleague, Chris Scruggs, "to criminal court division 1 with the copy of the order that was attached to this to talk with the judge about it and get things entered immediately."  (*Id.*)  Hagerman did not know whether the Clerk's office had received that order before Scruggs provided it to them.  (*Id.*)  He testified, "I mean they should have.  They should have docketed it, and we should have got this handled within weeks of the order."  (*Id.* at 16.)  The amended judgments were entered on September 12, 2014.  (*Id.* at 16-17.)[15]

Hagerman also testified as follows:

> Q.     Did you have any intention of acting contrary to this court's order in getting these judgments entered?
>
> A.     No, absolutely not.  As I say, maybe a bad one, but the procedure in our office for handling things like this, and I guess maybe we shouldn't be reliant on the criminal court clerk's office, but we rely on the criminal court clerk's office to docket this so that then we can take actions.

(§ 2255 Hr'g Tr. 17.)

---

[14] When Hagerman called Hixson after receipt of Means' March 21, 2014 letter, Hixson apparently did not pick up on the fact that Hagerman had not received the letter and copy of the order that Hixson had supposedly mailed to him.  (*See id.* at 12.)

[15] Hagerman was not asked whether copies of the amended judgments were served on Means.  His Petitioner for Issuance of an Unconditional Writ of Habeas Corpus makes no mention of untimely amended judgments.  (*See* Pet. for Unconditional Writ of Habeas Corpus at 2, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 38 (noting that the State and the TDOC "chose to totally ignore [the Court's] order" and "has refused to even respond").

On cross-examination by counsel for Means, Hagerman testified that he first saw Hixson's letter on September 10, 2014. (*Id.* at 18.) The letter was dated March 10, 2014 and was addressed to Amy Weirich with a courtesy copy to Hagerman. (*Id.* at 18-19.) At that point, the following exchange occurred:

> Q. So you would have received this letter with the attached order on March 10th of this year, not September 10th of this year?

> A. I should have received it, I did not.

> Q. Okay. So let me get this straight. When someone sends a letter and they CC someone, for example, here in this case, the attorney general's office, they CC an individual, that means that the person who is CC'ed would have received the letter and whatever attachments?

> A. It means a person should have received the letter, absolutely.

> Q. But in this case, what you're saying is that the attorney generals, although they CC'ed your name on it, on March the 10th of this year and enclosed a copy of the court's order, they didn't actually send it to you?

> A. I don't know if they sent it to me or not. I did not see this letter until the Wednesday of that week in September.

(*Id.* at 19.)

Hagerman testified that he read the letter when he received it on September 10, 2014. (*Id.* at 20.) In response to whether he knew that the deadline for compliance was September 2, 2014, Hagerman replied, "I saw on the letter September 2nd, and I saw my calendar September 12th." (*Id.*) Hagerman was asked whether he knew that the deadline for amending the judgments had already passed, and he responded, "I was fearful of that, absolutely." (*Id.* at 21.) Hagerman conceded that he did not call or email the Attorney General's Office ("the AG's Office") to advise them of the missed deadline. (*Id.* at 21-22.) Hagerman believed that he notified Steve Jones, who was responsible for appellate issues at the District Attorney General's

Office ("the DA's Office"). (*Id.* at 22.) In response to whether Jones would have been responsible for the matter at the DA's Office, Hagerman replied:

> And that may be almost sort of almost the structural problem. The people who would handle this in our office are the people who would be assigned to the courtroom of this would follow.
>
> Q. Right.
>
> A. So it would be criminal court division 1.
>
> Q. Right.
>
> A. If issues, you know, appellate issues, or something like that our office has to handle, to the extent that is that, Steve Jones would have been the person to talk to.

(*Id.* at 22-23.) Hagerman did not know whether Jones notified the AG's Office that the amended judgments had not been entered before the deadline. (*Id.* at 23.) Hagerman spoke to Deputy Attorney General Jennifer L. Smith at some time after September 12, but he did not recall when that conversation occurred. (*Id.*) In response to whether that conversation was in September 2014, Hagerman replied, "I really don't want to guess. I mean it could have been—I'd just totally be guessing, it could have been the l6th, it could have been the 23rd, it could have been the 30th, it could have been, you know, October 2nd, I don't know." (*Id.* at 24.)[16] Hagerman did not know whether anyone from the AG's Office advised the Court of the missed deadline. (*Id.* at 24-25.)

---

[16] Because Jennifer Smith had actual knowledge that the State had not complied with the conditional writ within the time specified, she had every reason to anticipate that Means would seek the issuance of an unconditional writ of habeas corpus. Given that state of affairs, the failure by the AG's Office to assign an attorney to the case and to respond to the Petition in a timely manner is striking.

Hagerman denied that he was responsible for communicating with the Criminal Court Clerk's office about entry of the amended judgments.  (*Id.* at 25-26.)  Means' counsel noted that Hagerman had visited the Clerk's Office on two occasions, and Hagerman explained:

> Absolutely, I did, went to the clerk's office, I went to the courtroom and talked to the courtroom clerks.  I took that on myself.  What I was advised and what I was operating under is the assumption, and the clerk's office confirmed this, they would docket it, and the prosecutors in Division 1 would handle it, and if they couldn't handle it, they would get in contact with me and I would try to handle it.

(*Id.* at 26.)  Hagerman testified that he was copied on Hixson's letter "[b]ecause I tried the cases. Whenever something happens in the attorney general's office in one of our cases that we tried, they get in contact with trial counsel."  (*Id.*)  Hagerman was not, however, tasked with the responsibility of ensuring that the amended judgments would be entered in a timely manner. (*Id.*)

Shelby County District Attorney General Amy Weirich, the addressee on Hixson's letter, also was not personally responsible for entering the amended judgments.  (*Id.* at 26-27.) Hagerman testified that "[s]he wouldn't be the one going to court and doing it either." (*Id.*)  At that point, the following exchange occurred:

> Q.    So the AG's office sent that letter to Amy Weirich and CC'ed it to you, they essentially were not sending it to anyone who actually had responsibility expressly for insuring compliance with this order?
>
> A.    I mean responsibility is a different word.  I mean the federal court issued an order, so we have got to take some responsibility, but the procedure that is in place, the way our office operates is the criminal court clerk's office would docket it, and we had three prosecutors assigned to that courtroom who then would handle it.

(*Id.* at 27.)

Hagerman was asked whether anyone from the AG's Office had contacted the DA's Office in April 2014 to follow up on the matter, and he replied:

The only time—I don't know, I remember I received one e-mail at some point, and I don't know if it was April, May, you know, June, saying that—from Mr. Hixson saying that he was leaving the office and that there was another individual who was going to take over for him.

Q.   Right.  But no one said what's happening with complying with Mr. Means' matter, there's no e-mail about that?

A.   Not that I remember.

Q.   There's no e-mail that says can you give us a status report on Mr. Means' case?

A.   No, sir.

(*Id.* at 28.)  He clarified that "when Mr. Hixson and I talked for the second time and when I received the letter from Mr. Means, I obviously talked the second time."  (*Id.* at 29.)  Hagerman did not receive an e-mail or any other communication from the AG's Office "in May or June or July or August other than the one e-mail just telling me Mr. Hixson was leaving and somebody else was taking over."  (*Id.* at 28-29.)  In response to whether he had received any communications in September, Hagerman testified that "[w]henever I talked with Jennifer Smith, that very well could have been September."  (*Id.* at 29.)

Hagerman conceded that Means was not responsible for the late entry of the amended judgments.  (*Id.* at 29-30.)

During argument on the Petition, counsel for Respondent apologized for missing the deadline and assured the Court that the AG's office "intends to take a belt and suspenders approach with these sort of orders going forward."  (*Id.* at 31.)  Specifically, counsel represented that, "going forward, the AG's office intends to send both a copy of this court's order to not only the local district attorney's office, but also the local criminal court clerk's office, so that both of those agencies are aware of the court's orders and can do what they need to do to get the matters docketed on time and comply with this court's orders in a timely manner."  (*Id.* at 31-32.)

## II.        THE LEGAL STANDARD

"Federal courts have broad discretion in conditioning a judgment granting habeas corpus relief, and may dispose of habeas corpus cases as law and justice require." *Pickens v. Howes*, 549 F.3d 377, 382 (6th Cir. 2008) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987)) (internal quotation marks omitted). "This broad discretion inherent in a district court's habeas powers includes the ability to evaluate whether the state has provided a legitimate reason for its delay in executing the conditions set forth in the writ." *McKitrick v. Jeffreys*, 255 F. App'x 74, 76 (6th Cir. 2007). "A federal district court retains jurisdiction to determine whether a party has complied with the terms of a conditional order in a habeas case." *Gentry v. Deuth*, 456 F.3d 687, 692 (6th Cir. 2006) (internal quotation marks omitted); *accord Girts v. Yanai*, 600 F.3d 576, 582 (6th Cir. 2010) ("[A] district court sitting in habeas has jurisdiction to consider the circumstances that exist up until either the state complies with a conditional writ or the court issues an unconditional writ . . . .").

Conditional writs of habeas corpus "are essentially accommodations accorded to the state. They represent a [habeas] court's holding that a[n] . . . infirmity justifies petitioner's release. The conditional nature of the order provides the state with a window of time within which it might cure . . . the error." *Satterlee v. Wolfenbarger*, 453 F.3d 362, 369 (6th Cir. 2006) (alterations in original) (citation omitted and internal quotation marks omitted).[17] "[T]he sole distinction between a conditional and an absolute grant of the writ of habeas corpus is that the

---

[17] A conditional writ of habeas corpus requires the State "either to release the prisoner from custody (or from a given type of sentence) or to retry (or resentence) her in a constitutional manner within a 'reasonable' period of time or within some specified period of time, typically 30, 60, 90 or 120 days." 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 33.3, at 1905 (6th ed. 2011). The State had 180 days' time to initiate proceedings in this case. *See supra* p. 8.

former lies latent unless and until the state fails to perform the established condition, at which time the writ springs to life." *Gentry*, 456 F.3d at 692.

The Sixth Circuit has stated unequivocally that "[w]hen the state fails to cure the error, i.e., when it fails to comply with the order's conditions, [a] conditional grant of a writ of habeas corpus *requires* the petitioner's release from custody." *Satterlee*, 453 F.3d at 369 (quoting *Fisher v. Rose*, 757 F.2d 789, 791 (6th Cir. 1985)) (internal quotation marks omitted). "[T]he law is absolutely clear that the writ releases the successful petitioner from the state's custody . . . ." *Gentry*, 456 F.3d at 696; *accord Wilkinson v. Dotson*, 544 U.S. 74, 87 (2005) (Scalia, J., concurring) ("Conditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one, and the consequence when they fail to do so is always release."). Conditional writs of habeas corpus "would be meaningless if a habeas court could not order a noncompliant state to release a prisoner." *Satterlee*, 453 F.3d at 369 n.5.

"When a petitioner alleges noncompliance with a conditional order, the district court must make a finding concerning the sufficiency of the action that the state has taken pursuant to the district court's mandate, and it must also evaluate the prejudice to the petitioner by any noncompliance." *McKitrick*, 255 F. App'x at 76. "Substantial compliance with the terms of the order may be sufficient." *Id.* The district court must also "evaluate whether the state has provided a legitimate reason for its delay in executing the conditions set forth in the writ." *Id.*[18] Moreover, "[t]he broad discretion of the habeas court in fashioning a proper remedy allows a district court to bar the state from reprosecuting the habeas petitioner in 'extraordinary

---

[18] The Court has the "discretion to grant an extension *post-hoc* if the time for compliance has passed." *Id.* at 77. Such an extension requires the Court to evaluate whether the State has "sufficiently complied with the order." *Id.*

circumstances.'" *D'Ambrosio v. Bagley*, 656 F.3d 379, 383 (6th Cir. 2011) (quoting *Satterlee*, 453 F.3d at 370).

III.        **ANALYSIS**

A.        **Findings of Fact**

The Court's task in evaluating the sufficiency of the State's compliance with the conditional writ is complicated by the fact that the only witness offered by the State, the Assistant District Attorney General who prosecuted Means, does not appear to be the person responsible for ensuring that the amended judgments were entered. The State has not offered a witness or even a factual affidavit from someone at the AG's Office and has not offered the testimony of the Shelby County District Attorney General or some other responsible person in the DA's Office who is familiar with the procedures in place for compliance with writs of habeas corpus. Based on the evidence presented at the evidentiary hearing, and the concessions and representations made by counsel by Respondent in this matter, the Court rejects Respondent's position that the failure to enter amended judgments within the 180 days provided in the conditional writ was attributable to Assistant District Attorney General Hagerman's error in recording the due date on his electronic calendar as September 12, 2014 rather than as September 2, 2014. (*See* Resp. to Pet. for Issuance of an Unconditional Writ of Habeas Corpus at 5, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 45.)

**The Court agrees with counsel for Means that the evidence establishes systemic flaws on the part of the AG's Office and the DA's Office.** The AG's Office is counsel of record in this matter. On March 6, 2014, the AG's Office was represented by Kyle Alexander Hixson. (*See* 11/08/2013 Not of Appearance, *id.*, ECF No. 33.) Several days before the issuance of the conditional writ on March 6, 2014, Hixson telephoned Hagerman to advise him of the

anticipated ruling. Once the ruling had issued, Hixson emailed Hagerman to inform him that the Court had ruled and that amended judgments would need to be entered. (§ 2255 Hr'g Tr. 8-10.) On or about March 10, 2014, Hixson drafted a letter to Shelby County District Attorney General Weirich advising of the issuance of the conditional writ and attaching a copy of the order. (*See id.* at 13-15.) Although the letter indicated that a courtesy copy had been sent to Hagerman, Hagerman testified that he did not receive a copy of the letter and order in the mail. (*Id.* at 18-19.)[19] The AG's Office has implicitly conceded that it did not mail a copy of the order to the Clerk of the Shelby County Criminal Court. (*See id.* at 31-32 (characterizing the AG's undertaking to mail a copy to the Criminal Court Clerk in the future as a "belt and suspenders approach").)

At some point during the 180 days after issuance of the conditional writ, Hixson left the AG's Office. Although he was, at the time, counsel of record in this case, Hixson failed to seek leave to withdraw, as required by Local Rule 83.5.[20] Counsel for Respondent have admitted that, at that time, they did not assign a new attorney to handle the case and, instead,

---

[19] Respondent's counsel has not addressed this aspect of the evidence, and it is difficult to discern what conclusions Respondent expects the Court to draw. The letter is not in evidence, and Respondent has introduced no proof that it was mailed to anyone on or about March 10, 2014. At most, the testimony at the evidentiary hearing establishes that the letter to Weirich was received on an unspecified date. Additionally, while the letter purportedly shows a courtesy copy to Hagerman, the Court will not assume that Hixson did, in fact, mail a copy of his letter and the Court's order to Hagerman. Hagerman's telephone conversation with Hixson after receipt of Means' March 21, 2014 letter should have, but apparently did not, alert Hixson to the fact that Hagerman did not have a copy of the Order. (*See id.* at 12.)

[20] The Rule provides, in pertinent part, that "[n]o attorney of record may withdraw in any case except on written motion and Court order. All motions for leave to withdraw shall include the reasons requiring withdrawal and the name and address of any substitute counsel." LR 83.5.

Hixson may well have believed that abandoning his caseload without notice to the Court was an acceptable practice in the AG's Office. When Hixson filed his Notice of Appearance, he notified the Court that the attorney assigned to the case at the time should "be withdrawn as counsel for Respondent" because he "is no longer employed by the State of Tennessee." (Not. of Appearance, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 33.)

administratively closed the file.   (Resp't's Mot. to Permit a Written Resp. at 2-3, *Means v. Phillips*, No. 2:11-cv- 02646-JPM-tmp (W.D. Tenn.), ECF No. 42.)   After Hixson's March 10, 2014 letter to Weirich, the AG's Office took no further steps to ensure that the amended judgments were entered in a timely manner.   The AG's Office failed even to monitor the situation.[21]

This failure by the AG's Office is not an isolated event.   Although the Court has no information on the number of instances in which the AG's Office has failed to meet the deadlines set in a conditional writ of habeas corpus, it is aware of one strikingly similar instance less than a year prior to the conditional writ in this case.   On March 28, 2013, the Court of Appeals issued its opinion in *Lovins v. Parker*, 712 F.3d 283, 302-03 (6th Cir. 2013), which conditionally granted a writ of habeas corpus to Derry Lovins on his *Blakely* sentencing claim.   The Court of Appeals concluded:

> [W]e are constrained to conclude that the judicial factfinding in Lovins's sentencing was unconstitutional and that the remedy Lovins requests is due.   We need not instruct the State how to provide this remedy, only that the remedy must either result in a reduction of Lovins's sentence from twenty-three to twenty years, or in resentencing under a procedure that does not violate the Sixth Amendment.   We afford the State 180 days from the date of this order to initiate the necessary proceedings.

*Id.* at 304.   On November 14, 2013, Lovins, through counsel, filed an Emergency Motion to Enforce Judgment by Making Conditional Writ an Unconditional Writ, which alleged that the State had taken no action whatsoever during the 180-day period.   (Emergency Mot. to Enforce J. at 1-2, *Lovins v. Parker*, 2:08-cv-02706-JPM-tmp (W.D.  Tenn.), ECF No. 31.)[22]   During a telephone hearing on the motion, counsel for Respondent was asked what steps were

---

[21] The record is silent about what prompted Deputy Attorney General Jennifer Smith to telephone Hagerman in or about September 2014, after the deadline for complying with the conditional writ had expired.

[22] Lovins' criminal judgments were obtained in Dyer County, Tennessee.

taken within the 180-day period to proceed as directed by the Sixth Circuit, and the Assistant

Attorney General replied, in pertinent part, as follows:

> It's my understanding that there was no effort taken during that 180-day period. I just learned about the existence of this case last week when this motion was filed. It's my understanding that Mr. Cherry (phonetic), who is on military leave today and therefore not conducting this hearing, simply did not tell anyone that the order had come through because he expected that the District Attorney's Office was receiving a copy of it and that they were taking care of it. But the District Attorney's Office actually had no knowledge of the order.

(Hr'g Tr. 10, *id.*, ECF No. 52.)[23]

Since the issuance of the Court's order in *Lovins*, the AG's Office has undertaken to

notify the local DA's Office when a federal court has issued a conditional writ of habeas

corpus.[24] It has not, however, seen fit to provide a copy of the order to the trial court in which

the criminal case originated.[25] It also has abandoned its responsibility as counsel of record in

this matter to keep an attorney assigned to the case while it is active, to monitor whether the local

DA's Office has complied with the conditional writ, to file a timely motion for an extension of

---

[23] Brent Cherry, the attorney assigned to the case was apparently still employed by the AG's Office but was on military leave at various times during the 180-day period. (*Id.* at 11-12.) The attorney who represented the Warden at that hearing was not Cherry's supervisor or even a member of Cherry's "habeas team" and apparently had no connection to the matter other than the fact that he was available to participate in a conference call at the designated time. (*See id.* at 11.)

[24] Regardless of whether Hixson timely mailed a copy of the order to Weirich in March 2014, a fact which has not been proven, it is undisputed that he notified Hagerman of the decision shortly after its issuance. At some point, he also provided Weirich with a copy of the decision.

[25] The attitude of the AG's Office in this regard is puzzling. For future reference, orders issued in federal habeas cases are transmitted only to counsel of record and to the petitioner if he is *pro se*. It is the responsibility of the AG's Office, as counsel of record for respondents, to transmit the federal court orders to its clients, the local DA's offices and court clerks.

time if required, and to notify the Court if compliance has not been achieved before the expiration of the 180-day window.[26]

The failures on the part of the DA's Office also appear to have been systemic. It is difficult to draw conclusions about the scope of those failures because Respondent has not offered the testimony of Weirich or of Steve Jones, who is apparently her deputy in charge of appellate matters. When Weirich received Hixson's letter and the attached court order, she apparently gave it to Jones, who summarized it and highlighted the pertinent parts. (§ 2255 Hr'g Tr. 13-14.) There is no evidence that Weirich or Jones took any action to comply with the order until September 10, 2014, eight days after the date set for compliance.[27] Neither Weirich nor Jones took any action to follow up with Hagerman or the Division 1 prosecutor to ensure that the amended judgments were entered until more than one week after the deadline for amending the judgments had passed. At that point, Jones (or someone acting at his behest) contacted Hagerman rather than the prosecutor assigned to Criminal Court Division 1, who, according to Hagerman, was the person responsible for ensuring that the amended judgments were entered. (*Id.*) At that point, Hagerman sent a colleague to the Criminal Court with a copy of the Order. (*Id.* at 16.) There also is no evidence that Weirich, Jones, or anyone else from the DA's Office

---

[26] This failure is exemplified by the fact that Hagerman had a conversation with Deputy Attorney General Jennifer Smith in September or early October 2014, yet Smith took no steps to communicate with the Court and also failed to respond to Means' Petition for Issuance of an Unconditional Writ of Habeas Corpus in a timely manner. This lapse was not explored at the evidentiary hearing.

[27] It is conceivable that Weirich and Jones were relying on the fact that the letter showed a courtesy copy to Hagerman.

attempted to contact the AG's Office to advise them that the amended judgments had not been entered in a timely manner.[28]

## B. Conclusions of Law

### 1. Means is Entitled to be Unconditionally Released from the Convictions at Issue

The March 6, 2014 Order directed that "[t]he State must either reduce Means' sentence for each count from nine years to eight years or must afford Means a new sentencing hearing within one hundred eighty (180) days from the date of entry of this Order." (Order at 8, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 37.) The State did not comply with the Court's order within the time specified, although the DA's Office belatedly, and without notice to the Court (or, most likely, to Means), entered amended judgments ten days after the expiration of the deadline.

Because Respondent failed to comply with the conditional writ, Means is entitled to issuance of an unconditional writ as to the convictions at issue. In *Satterlee*, a conditional writ of habeas corpus was granted to the petitioner because his counsel failed to communicate a favorable plea offer. 453 F.3d at 364-65. The state missed its sixty-day deadline to reinstate the plea offer to the petitioner, and sought an untimely stay, which the district court denied. *Id.* at 365. The district court ordered the state immediately to release the petitioner from custody, which the Sixth Circuit affirmed in light of the fact that the state "did not comply with the conditional writ." *Id.* at 369. The Sixth Circuit stated that it is a "well-settled precedent and practice . . . that the consequence of a state's failure to comply with a conditional writ is release of the prisoner." *Id.* at 369 n.6. The command of *Satterlee* is thus unambiguous: "When the

---

[28] Of course, if they had attempted to contact the AG's Office, they might have discovered that Hixson had resigned his position and that no other attorney had been assigned to the case.

state fails . . . to comply with the order's conditions, [a] conditional writ of habeas corpus requires the petitioner's release from custody." *Id.* at 369 (internal quotation marks omitted); *see also* 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 33.3, at 1906-07 ("If the state fails to act within the time set for retrial (or for some other proceeding) to occur, the petitioner must be released from custody immediately.").

In his Response to the Petition for Issuance of an Unconditional Writ of Habeas Corpus, Respondent notes that the Court is authorized to grant a ten-day extension of the time for compliance with the conditional writ. (Resp. to Pet. for Issuance of an Unconditional Writ of Habeas Corpus at 2-3, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 45.) Respondent relies on the Sixth Circuit's decision in *McKitrick*, 255 F. App'x at 77, which states that, "[a]lthough it is preferable for the state to request an extension of time from the district court before the time for compliance expires . . . , it is also within the district court's discretion to grant an extension *post-hoc* if the time for compliance has passed."

Before the Court can grant a *post hoc* extension, it must determine whether the State has substantially complied with the conditional writ. *See id.* at 76 ("*Satterlee* does not require immediate release in all cases where a term of the conditional writ was not performed precisely as ordered. The district court may make exceptions when the state has 'substantially complied' with the terms of the order.").[29]

In *McKitrick*, the district court had granted a conditional writ of habeas corpus to a petitioner who pled guilty to kidnapping and robbery and gave the state ninety days to resentence

_____

[29] As examples of "substantial compliance," the *McKitrick* court cited *Rose v. Engle*, No. 85-3740, 1986 WL 16122 (6th Cir. Sept. 9, 1986) (finding substantial compliance where release or retrial occurred within sixty days of the Supreme Court's denial of certiorari, and the State had timely pursued avenues of appeal), and *Santos-Rosario v. Renico*, No. 05-CV-70456, 2006 WL 847111, at *1-2 (E.D. Mich. Mar. 30, 2000) (finding substantial compliance where the State appointed counsel for petitioner two weeks after the ninety-day time frame for compliance).

the petitioner.  255 F. App'x at 75.  The state failed to resentence the petitioner until the ninety-first day, though it had initiated proceedings on time.  *Id.*  Based on this one-day delay, and the fact that "the State did not simply ignore the district court's order and take no action," the Sixth Circuit upheld the district court's extension of time to comply with the conditional writ.  *Id.* at 77.

In *Lovins*, by contrast, the State did not substantially comply with the conditional writ until fifty-six days after the deadline had elapsed.  "Even then, the State admitted at the hearing on November 22, 2013, that its action was prompted by the filing of the [Emergency Motion to Enforce Judgment]."  (Order at 14-15, *Lovins v. Parker*, No. 2:08-cv-02706-JPM-tmp (W.D. Tenn.), ECF No. 44 (citation omitted).)  The Court observed that "the State's motion for an extension of time is significantly tardy."  (*Id.* at 15.)  The Court found that "the State's failure to act is without excuse" and that "[r]elief under *McKitrick* is unavailable where the State simply ignores the order and takes no action."  (*Id.* at 17-18 (internal quotation marks, alteration and ellipses omitted).)

Although the State's actions in this case are not quite as egregious as those in *Lovins*, this case is far closer to *Lovins* than it is to *McKitrick*.  Unlike *Lovins*, the AG's Office made modest efforts to advise the DA's Office that a conditional writ had been issued.  The prosecutor from the DA's Office ordered the case file and checked to see whether the order had been received by the Criminal Court Clerk.  The amended judgments were entered only ten days after the deadline for compliance and before the filing of Means' Petition for Issuance of an Unconditional Writ of Habeas Corpus.  These efforts, which are concededly more than occurred in *Lovins*, pale in comparison to the systemic failures by both the AG's Office and the DA's Office that the Court has previously itemized.  *See supra* pp. 24-29.

The State did not substantially comply with the conditional writ prior to the expiration of the 180-day period. Therefore, the Court ORDERS that Respondent unconditionally release Means from custody on his convictions in Case Numbers 03-05190, 03-05192 and 03-05194 within five business days from the date of entry of this order.[30] Respondent's request for a ten-day *post hoc* extension of time is DENIED.

## 2. Notwithstanding the State's Lack of Diligence, the Court Will Not Prohibit the State From Resentencing Means

In his Response to Respondent's Supplemental Brief, Means asks that "the Court prohibit or limit any future resentencing that the State may potentially seek . . . ." (Pet'r's Resp. to Resp't's Suppl. Br. at 6, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 69.) The standards for determining whether to allow prosecution or resentencing are as follows:

> "In a typical case in which a prisoner is released because a state fails to retry the prisoner by the deadline set in a conditional writ, the state is not precluded from rearresting petitioner and retrying him under the same indictment." *Satterlee v. Wolfenbarger*, 453 F.3d 362, 370 (6th Cir. 2006) (internal quotation marks omitted). However, "[t]he broad discretion of the habeas court in fashioning a proper remedy allows a district court to bar the state from reprosecuting the habeas petitioner in 'extraordinary circumstances.'" *D'Ambrosia v. Bagley*, 656 F.3d 379, 383 (6th Cir. 2011) (quoting *Satterlee*, 453 F.3d at 370). A habeas court "may forbid reprosecution" in "extraordinary circumstances, such as when the state inexcusably, repeatedly, or otherwise abusively fails to act within the prescribed time period or if the state's delay is likely to prejudice the petitioner's ability to mount a defense at trial." *Satterlee*, 453 F.3d at 370 (internal quotation marks and alterations omitted).

*Lovins v. Parker*, 604 F. App'x 489, 490-91 (6th Cir. 2015).

---

[30] The Petition also asks "[t]hat any and all time served on these sentences and all good time earned be applied to the other sentence the Petitioner is presently serving, Case No. #03-05193." (Pet. for an Unconditional Writ of Habeas Corpus at 3, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 38.) Means has not briefed this request for relief, and because his convictions are valid, it does not appear that he is entitled to the relief sought. This aspect of the Petition is DENIED.

In *Lovins*, the Court allowed the State to rearrest the petitioner and to resentence him. (Order at 18-23, *Lovins v. Parker*, No. 2:08-cv-02706-JPM-tmp (W.D. Tenn.), ECF No. 44.) The Court reasoned that, while it "cannot approve of the State's serious lack of diligence, the particular facts of this case do not rise to the level of 'extraordinary circumstances,' such as to preclude rearrest and resentencing." (*Id.* at 22.) Lovins appealed that determination, and the Sixth Circuit affirmed, holding that "[w]e agree with the district court that the facts of this case do not rise to the level of 'extraordinary circumstances.'" *Lovins*, 604 F. App'x at 491. The Sixth Circuit reasoned as follows:

> Three facts weigh against granting exceptional relief. First, the state's failure to comply with the conditional writ, while troubling, was not committed in bad faith. The state asserted that it failed to act due to miscommunication between state entities. Second, the state's error lasted a relatively short period of time, and the state quickly complied with the writ after the error was brought to its attention. Finally and importantly, Lovins's conviction is valid. Only the length of his sentence is at issue. At the time of release, Lovins had served approximately eleven years and six months of a twenty-three-year sentence. Accordingly, when he was resentenced to twenty years, he had not served time on an invalid conviction or served more than the statutory maximum of twenty years. Similarly, because his conviction was not at issue, the state's delay was not "likely to prejudice the petitioner's ability to mount a defense at trial." *Satterlee*, 453 F.3d at 370 (internal quotation marks omitted).

*Id.*

Each of these factors is present, to some degree, in this case. The State did not act in bad faith, although its repeated failures to ensure compliance with conditional writs are of great concern to the Court. The amended judgments were entered only ten days past the 180-day window for compliance with the conditional writ, and unlike in *Lovins*, the State took steps to correct its error prior to the filing of Means' Petition for an Unconditional Writ of Habeas Corpus. Finally, Means' convictions are valid, and he has not served time on an invalid conviction or been imprisoned past the maximum sentence that could be imposed. Therefore,

there is substantial basis to conclude that, as in *Lovins*, this case does not present an "extraordinary circumstance" that would justify an order prohibiting the State from resentencing Means.

Means' equitable arguments are entitled to some weight. In his Reply, Means notes that, in another § 2254 case challenging additional convictions for aggravated robbery, his petition was denied as untimely and his request for equitable tolling was denied because it was asserted, for the first time, in a post-judgment motion. (Reply at 3, *Means v. Phillips*, No. 2:11-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 66 (referencing *Means v. Jones*, No. 2:12-cv-02648-STA-cgc (W.D. Tenn.).) Means argues, in effect, that it is inequitable to penalize a *pro se* habeas petitioner for failing to comply with deadlines and rules while, at the same time, forgiving the unexcused failures of the State to follow similar rules. (*See id.* at 3-4.) This argument has some force.[31] Attorneys from the AG's Office have displayed a remarkably casual attitude toward rules and deadlines in their handling of § 2254 cases. Attorneys from the AG's Office routinely withdraw from cases without complying with the requirements of Local Rule 83.5. *See supra* p. 25 n.20. Assistant Attorney Generals also often take additional time to file the state-court record without seeking leave of Court or providing any explanation for their inability to provide the records by the deadline that had been set.[32]

---

[31] The situations are not precisely parallel. Congress has imposed strict time limitations on the filing of § 2254 petitions. *See* 28 U.S.C. § 2254(d). The Court is not free to address the merits of a time-barred habeas petition unless the stringent requirements for equitable tolling have been satisfied. Although it is, unfortunately, common for habeas respondents to fail to comply with deadlines, the entry of default is governed by Rule 55(a) of the Federal Rules of Civil Procedure, which "has no application in habeas corpus cases." *Allen v. Perini*, 424 F.2d 134, 138 (6th Cir. 1970). District courts may not enter default judgments in habeas cases without addressing the merits of a prisoner's claims. *Id.* The Court attempts to give habeas petitioners the same consideration that it gives to respondents with respect to extensions of time.

[32] *See, e.g.*, Order at 3 n.1, *Moore v. Parris*, No. 1:14-cv-01162-JDB-egb (W.D. Tenn. Sept. 21, 2015), ECF No. 20 (citation omitted) ("The state-court record was submitted four days

The Court is also troubled by the seeming disinterest of the Assistant Attorney General who represented the State in these proceedings in exploring what went wrong in the State's efforts to comply with the conditional writ in this case. Instead, counsel has chosen to present Hagerman as a convenient scapegoat and to argue a lack of prejudice. The Court is, nevertheless, reluctant to order that a serious offender like Means be released from serving any further time on his sentences.[33] If the Court were to accept the State's reasoning, however, it would appear that a prisoner could rarely show prejudice from the State's failure to comply with a conditional writ arising from a sentencing error and, therefore, little reason to believe that the State would undertake the serious efforts to correct the systemic deficiencies in its handling of § 2254 petitions and, in particular, conditional writs that appear to be necessary.

In *Lovins*, the Court of Appeals warned that "*Satterlee* leaves open the possibility that a state's 'inexcusable' failure to act by the deadline imposed by the court could be a sufficient basis alone to bar reprosecution." 604 F. App'x at 492 n.1. The Court will not bar

_____

past the deadline of February 19, 2015. Respondent did not provide an explanation for his late filing and did not seek a further extension of time to file the state-court record."); Order at 5 n.3, *Winkfield v. Lindamood*, No. 1:14-cv-01182-JDB-egb (W.D. Tenn. Sept. 17, 2015), ECF No. 23 ("The proper procedure is to file a motion seeking an extension of time, accompanied by an explanation for the requested extension, rather than to announce that additional time will be taken."); Order at 2 n.2, *Hill v. Perry*, No. 1:13-cv-01328-JDB-egb (W.D. Tenn. July 23, 2015), ECF No. 13 ("Respondent did not seek an extension of time and has provided no explanation for her late filing. The judges in this district have repeatedly reminded the Attorney General's Office that it is not proper to disregard filing deadlines."); Order at 6 n.3, *Wright v. Donahue*, No. 2:11-cv-03102-SHM-tmp (W.D. Tenn. Mar. 31, 2015), ECF No. 32; Order at 3 n.3, *Jones v. Donahue*, No. 2:12-cv-02168-SHL-tmp (W.D. Tenn. Mar. 18, 2015), ECF No. 20; Order at 9 n.1, *Hanebutt v. Carpenter*, No. 1:11-cv-01192-JDB-egb (W.D. Tenn. Sept. 26, 2014), ECF No. 26; Order at 19 n.5, *Skinner v. Johnson*, No. 2:11-cv-02112-SHL-dkv (W.D. Tenn. Aug. 6, 2014), ECF No. 64; Order at 9 n.24, *Cribbs v. Chapman*, No. 2:10-cv-02746-SHM-dkv (W.D. Tenn. Feb. 21 , 2014), ECF No. 17.

[33] The Court also is not persuaded that Means suffered any real prejudice due to the State's failure to hold a hearing at which he could argue against the imposition of consecutive sentences. There was never any requirement that the State do anything other than enter amended judgments with eight-year sentences. (*See* Order at 8, *Means v. Phillips*, No. 2-ll-cv-02646-JPM-tmp (W.D. Tenn.), ECF No. 37.)

reprosecution/resentencing in this case because it is persuaded that, by vacating Means'
judgments in the cases at issue, the State will have to suffer a real consequence by having to
conduct a new sentencing hearing at which the issue of consecutive sentencing must be
addressed unless the State elects to forego consecutive sentencing. *See supra* p. 12 n.11. To
avoid any possible misunderstanding, the Court ORDERS that the State is not barred from
resentencing Means in Case Numbers 03-05190, 03-05192 and 03-05194 **provided that** the
length of the sentences to be imposed may be no greater than the eight years for each offense that
was contained in the amended judgments entered on September 12, 2014.[34] The Court also
ORDERS that consecutive sentencing may be imposed only if the State files a motion seeking an
enhanced sentence and only after a hearing in which Means has the opportunity to present
mitigation evidence.

## IV.    CONCLUSION

For the reasons stated above, Means' Petition for Issuance of an Unconditional Writ of
Habeas Corpus is GRANTED IN PART as to Petitioner's request to make the conditional writ of
habeas corpus an unconditional writ. The Petition is DENIED IN PART as to Petitioner's
request that the time spent in custody on the judgments at issue be credited to his other sentences
and as to his request that the State be prohibited from resentencing him.

Accordingly, the Court ORDERS Respondent to unconditionally release Petitioner from
custody on the judgments in Case Numbers 03-05190, 03-05192 and 03-05194 no later than five

---

[34] The Court is troubled by the State's suggestion that, if Means were afforded a new
sentencing hearing, "he stands to receive lengthier sentences than are imposed by the September
12, 2014 amended judgments." (Resp't's Suppl. Br. at 6, *Means v. Phillips*, No. 2:11-cv-02646-
JPM-tmp (W.D. Tenn.), ECF No. 68.) In would be inequitable in the extreme for Means to be
punished for successfully seeking habeas relief, and for protesting the State's unexcused failure
to comply with the conditional writs, by receiving longer sentences than he would have gotten
had he remained silent.

business days from the date of entry of this order.  The State is not prohibited from resentencing Petitioner on these convictions, provided that the length of the sentences to be imposed must be no longer than the eight years for each offense that was contained in the amended judgments entered on September 12, 2014.  Consecutive sentencing may be imposed only if the State files a motion seeking an enhanced sentence and only after a hearing in which Means has the opportunity to present mitigation evidence.

IT IS SO ORDERED this 30th day of September, 2015.


s/ JON PHIPPS McCALLA
UNITED STATES DISTRICT JUDGE